The first two cases have the same issue in each of them, and we think it makes some sense to just go ahead and consolidate them, give you extra time as you need it, and cover that. If the facts of the two cases vary and make a difference, you, of course, want to point those out, but we have read the briefs, but the issue itself is the same. So why don't we start out with the appellant. The appellant in Groff. Yeah, that's, yeah. Thank you, Your Honor, and may it please the court, the court should reverse in Groff and it should affirm the bar. In Groff, the substantial evidence, well, on pages 1355 and 1799 of the appendix in Groff, is, are substantial evidence that Mr. Groff was not acting, was not serving. Well, let me stop you right there. I spoke to, so I want to make sure, do you object to the government going first? I have no objection. You have no objection, all right. All right, go ahead. On page 1799 and 1355, there is substantial evidence that Mr. Groff was not serving the public agency in an official capacity. On 1799 are the provisions of the contract that demonstrate this. That the employees of the contractors in the performance of the agreement shall act in an independent capacity. And not as agents of the state of California. The previous paragraph, paragraph one, is one in which the contractor indemnifies the state of California against liability for the actions of its employees and agents. If that were not the case, if Mr. Groff were serving in an official capacity, those provisions would not be in the contract. Those provisions establish that he is not, he was not serving in an official capacity. There was a wall, in effect, between Mr. Groff and the state of California that makes his acts not the acts of the state of California, but the acts of his employer, San Joaquin Helicopters. Mr. McAmel, last August, I guess it was, the department issued a new regulation that appears by the explanation that's given for the regulation to be specifically directed at this issue. And in fact, it names, I guess, the other case, the LaBaer case. Does that regulation, to the extent that it is applicable here, decide this case, in your view? Well, if it were applicable here, it would decide the case. Okay, do you think that it's not applicable here? It is not applicable here, because that took effect in September of last year, and these two cases are under the, well, what's now 28 CFR, what has been added to 28 CFR 32.3 was not in effect when these cases were decided. So, but why does that matter when what we're talking about is a Chevron issue? Chevron, as I understand it, would apply, Chevron deference to a regulatory construction of a statute would apply even retroactively. That is to say, if you have a new regulation that applies even to the same action, litigation that's ongoing, my understanding is, and the Supreme Court has said, nonetheless, as long as there's full notice and comment procedures in connection with the promulgation of the regulation, that the regulation governs that litigation. Why isn't that this case? It might be, I have to say, I have not researched the retroactivity of regulations to cases that were decided under a previous regulation. Assuming that it does apply, then the result is the same. The agency indicated in its comment to those proposed regulations that it was following this established rule that grew out of, I don't recall if they mentioned Holstein, but they mentioned Labar, and I seem to remember they also mentioned Groff. And so it makes sense to read this new regulation as leading to the same result in a case just like Groff and Labar. And so, and what that regulation does is says if the acts of the decedent are not the acts of the public agency, in that the public agency hasn't assumed legal responsibility for those acts, or at least not denied it, then that person was not serving in an official capacity. And in both Groff and Labar, the contracts show that these decedents were not a part of the acts that the agency itself had assumed responsibility for. Otherwise, the agency would be responsible, presumably, for the, for even the negligent acts of those pilots. And the agencies in both cases set it up so that having privatized this service, they were not responsible. What about volunteers? Are agencies responsible for the volunteers' negligent acts to volunteers necessarily? They, yes, I expect they would be. Unless there is some special agreement between the volunteer and the public agency that disclaims such responsibility, then presumably if a public agency were to take on a volunteer as part of its, as a member of its agency, and the volunteer goes out and does something to the public that, in the performance of that duty assigned to him or her, then yes, the agency would be liable, and therefore, and that would be an indication that the volunteer was acting, was serving in an official capacity. The strongest argument that the claimants make in both cases is that the filling out of that report, the public safety officer death report, and in the Groff case, the letters written to BJA by the, by the state of California, established that both claimants were, were public safety officers. But that is a legal conclusion to which BJA does not have to give any difference at all. And this court most recently in Amber Messick and as far back as, as Demutis, established that, that only the findings of fact or the evidence presented by a state investigative or administrative agency need to be given substantial weight. But, so, it is, it is not, it's not conclusive, certainly, that a public agency after, after the death of somebody who was working for a contractor fills out a form. That doesn't establish that the decedent was a, was a public safety officer. That ultimate question, that ultimate conclusion is in the hands, is entrusted to BJA pursuant to the statute. And only the subsidiary factual determinations that might have led the agency to that conclusion would be entitled to any weight. So, if we were to look at page 1247 of the Groff Appendix, that is the September 3rd, 2002 letter from the, from the public agency. And they list some of the reasons that, in their opinion, and they use that, they use that phrase, in their opinion, indicating it's a legal opinion, that he was serving in an official capacity. And one of them is, and I'm just picking one, number five is that he ate state-furnished meals. Now, if it were important to, to the BJA's determination whether Mr. Groff was a public safety officer, to, to know whether he ate state-furnished meals, then BJA would have to give substantial weight to that evidence. But he, but it doesn't have to go that next step that the state does. It doesn't have to say, because the state decides now, after his death, that he, in its opinion, is a public safety officer. That he actually was serving in, in an official capacity. But, but even, but the task of this Court and the Court of Federal Claims in reviewing these decisions is not to weigh the evidence again. It is to decide whether there is substantial evidence supporting the BJA's opinion. And the contractual paragraphs that I pointed to in, in, in the Groff Appendix and in, in the LaBar Appendix, those are on pages 2683, paragraph 6, 2704, paragraph 3, 2705, paragraph 2. Those, those indicate that those are substantial evidence. Whatever else, whatever else the claimants in these cases can point to, that, those are, that is substantial evidence that supports the BJA's opinion. In the Groff case on page 2704, paragraph 3 is a, is a provision that requires the contractor to replace a pilot who flies recklessly or whose performance is, is unsatisfactory. Now, if the pilot were actually a part of, of the, of the fire service, had been a pilot, a part of the fire service, the fire service itself could fire the pilot or replace the pilot. But this required, this has this additional step that the, that the contractor is responsible for replacing the pilot. And on page 270, on page, sorry, it's on 2807, it's the next page in the appendix. Paragraph 2 says that, and this is like the indemnification paragraph in the Groff Appendix, that the contractor shall be responsible for all damage to persons that are, that occur as a result of his agent's or employee's fault or negligence. That, if, if Mr. LaBar was actually a part of the fire service, then it would be the contractor's actions, not, not the contractor. And the, the, the issue of whether a BJA pronouncement like this, that is that somebody who can only show that his or her decedent had a relationship with a public agency that grew out of a contract is not a public safety officer. That is entitled to deference. This, this court last month said that BJA pronouncements are entitled to be looked at with the, they're entitled to the force of law or they're regarded as having the force of law. That, that extends to this kind of determination too. And all it means is that if, if, if all a claimant can point to is evidence of a relationship between the decedent and the public agency that grows out of a contract with the public agency, that is not enough to prove, and it's their burden to prove, that the decedent was serving the public agency in an official capacity. The, the argument that the 1976 colloquy between representatives Meyer and Ellsberg on the floor is, is, is not entitled to any weight is, is wrong. This court in at least three PSOB cases, Casella, Hawkins, and Yanko, looked itself to floor statements to decide whether particular BJA interpretations or regulations were, were permissible. Even two of the Supreme Court cases that the claimants cite to, in, in two of those cases, Chrysler Corp and Consumer Product Safety Commission, the court, the Supreme Court also looked to statements of representatives on, on the floor. In Chrysler Corp, 441 U.S. at page 311, in the sentence after the sentence that claimant cite, the court said that Congressman, Congressman Moss's statement must be considered with the reports of both houses and the statements of other congressmen. All of which it said refuted the respondent's interpretation. Here we have, we, we have the only indication in any of the legislative history of anything Congress thought on the issue whether privately employed individuals were going to be covered as public safety officers. And the indication is that they were not to be covered. Which makes BJA's interpretation of the phrase serving an official, serving in the capacity on this point permissible. Nothing points to any indication contrary to that, that, that, that BJA's predecessor in Holstein and BJA itself in these two cases relied upon. For, for those reasons the court should reverse and gruff and affirm in the bar. Thank you. Thank you, Mr. Greg. Thank you, Your Honor. Before I begin, since we've consolidated these matters, should I just assume that I should just go for up to 15 minutes and then we'll figure it out, get it figured out from there? Yeah, same for 15 and we'll give you, we're going to give you the last word anyway. We'll let the government come back and respond, reply and you can signify. Thank you, Your Honor. Yes. Thank you, Your Honors. May it please the court and counsel for the record. My name is Peter Gray, G-R-A-Y and I represent the appellees, Christine Wells-Groth and Michael Wells in this matter and the appellant, Gloria LaBaer in the second matter. Your Honors, for purposes of the PSOBA, there is no difference between a firefighter who is suppressing fires for the government under contract and a firefighter who's suppressing fires for the government as an employee. Let me ask you, before you get into the heart of your argument, I have a concern that I've shared with Mr. McElmaine and I would like you to address it as well, is the status of this relatively new regulation and its impact on this case. You know the regulation that I'm referring to, the August regulation. I guess the first question is, do you think that that regulation would be dispositive of either of these or both of these cases to the extent that it applies? Assuming it applied, no, it would not be dispositive because that regulation, the per se exclusion of private contractors, is not entitled to be in Chevron deference. Now having said that... Okay, now to make sure I understand, so you're making an argument that the regulation falls at what we refer to as Chevron step one. In other words, that the statute is so clear that even if the, and to the extent that the agency has authority to promulgate regulations construing the statute, and even if that regulation purports to do so and is applicable in this case, the regulation is outside of the realm of reasonable construction of the statute. I believe it would fall either at step one because I do believe that the statute, on its face, encompasses my clients. I also believe it would fall at step two were we to go there. If the statute were to be deemed ambiguous, I don't believe that this is a permissive construction. Okay, now assume for the moment that we would disagree with those two propositions, do you think the text of the regulation, were it to be deemed applicable, would govern in these two cases? That is to say, does this regulation, if it applies, does this regulation decide these cases? If you were to determine to extend Chevron deference to this regulation, yes, I would agree that that would apply, that would govern. However, I don't believe that the regulation applies for any number of reasons. Well, you've given one reason so far, which is that it's inconsistent, you think, with the statute. More importantly, Your Honors, in the briefs that the government has submitted, Mr. Mack and all his colleagues have properly noted that we did not raise an argument in our briefs that we raised below, which is that there was an arbitrary and capricious distinction between private contractors who died as a result of the 9-11 events and private contractors, caretakers. We did not raise that argument on appeal. We consciously elected not to pursue it. And Mr. Mackel-Mill, in his brief, properly argues that we waived it as a result. Now, in this case, Your Honor, the government has never argued that these regulations have retroactive application. I don't believe that they're arguing that now, and I certainly don't believe they could raise the argument for the first time of oral argument. They cite to the case of this court's case. Well, to be fair to them, they didn't raise it. No, they didn't raise it. No, and I'm not chastising them. Right, OK. I'm just saying that under these circumstances, they can't. And I think the Becton-Dickinson case pretty clearly states that. In the Becton-Dickinson case, this court did not allow an appellant to raise arguments that its patent claims were actually valid instead of invalid for the first time in a replied brief. Of course, they are taking the position that the position taken by the Department of Justice over the years is entitled to Chevron deference. They are taking that position. And that position is the position that is, at least by its text, incorporated into, or so the regulation says, into the regulation. So I suppose that it isn't a huge leap to say that, well, the regulation is simply a regulatory codification of a position taken over the years. Well, Your Honor, I guess I would disagree with that because this is a difference, perhaps a form, but I think it's also one of substance. We have never operated, and the government has never argued that we are subject to the new regulations. Now, certainly, if we had, if we were operating under that assumption, we would have vigorously protested. There are, notice and comment is there for a reason. You can be certain that we would have raised protests and argued that these regulations cannot be adopted, and we perhaps would have enlisted the help of others. We, notice and comment exists for a reason. A regulation that has been put forward through notice and comment and published through the Federal Register is entitled to considerably more deference than a mere agency interpretation because it has been vetted. It has been put out there for the public at large to weigh in upon. That was not the case with this distinction when it was merely embodied in a three-page hearing officer's opinion and decided in a single case, which is what it was as part of the whole scheme decision. This is not, I submit to you, merely a formal distinction. It is a basic core democratic distinction, and I believe it would be unfair, arbitrary, perhaps even a violation of my client's due process rights to apply a regulation to afford to equate a legal interpretation, the weight of a subsequently enacted regulation that has no application to this case. Let me ask you, I understand your point that you weren't advised, at least the government didn't raise this in its briefing here in this case, but you also just seem to be making the additional point that in order to do notice and comment rulemaking, which might or might not apply to your client, that you were somehow required to have notice of that so that you might properly have intervened or provided some comment. Is that what you're saying, that parties who have pending cases involving this issue were required to have some special notification if the government was contemplating rulemaking in this area? No, I think my point, Your Honor, is that if the government were to have taken the position that not only is this position entitled to deference because it is a legal interpretation, but we're in the process of codifying it, and you can bet that when it's codified, that it's going to reach back and retroactively grab this and elevate this to a matter of Chevron deference, which we don't believe it is. We believe it's a matter of Skidmore deference at most. We certainly would have taken active steps to oppose the promulgation of the regulation, but as it is, Your Honor, I represent two clients who didn't have a dog in that fight. My two clients were indisputably not governed by the regulation, and they were governed by the legal interpretations document as reflected in Holstein. Well, I don't know whether you, it seems to me your clients may have had a dog in that fight. According to the Supreme Court, and there are several Supreme Court opinions that say, and one of them is Smiley against Citibank, says it does not matter, and this is a case of Chevron deference to a regulation promulgated after the initial dispute that was in litigation. The court says it does not matter that the regulation was prompted by litigation, including this very suit. They say that we have before us a full dress regulation issued by the controller and adopted pursuant to notice and comment procedures, that it was litigation which disclosed the need for the regulation is irrelevant. So that would seem to suggest that at least in August, when that regulation was promulgated, it was fully applicable for Chevron purposes to these cases, even though it was these cases, or at least the LaBear case, that may have precipitated the need for the regulation. So maybe you're right that the government, not having raised it in their subsequent brief in this court, has forfeited the right to make that argument, but it doesn't seem to be right to say that your client has some kind of due process concern with the application of the regulation. That perhaps is the case, Your Honor, but I do believe that it would be grossly unfair to allow to interject this at this time for the reasons I articulated earlier. The regulation was adopted after both opinions were issued by the court claims. It actually did not become effective until September, I believe September 10th of 2007, and since the government has never raised it, and since it's only now being addressed by the court at oral argument, I just do not believe the principles of fairness, plump fairness, allow it to be interjected at this time, and I also do believe it's waived. If the court would like, I'd be happy to address why this interpretation, this per se exclusion of firefighters is entitled to no deference. Since that's the position that the Department of Justice has taken over the years, then that's pertinent to the legal issue in this case. So, I mean, I think it's perfectly appropriate for you to address that question, Your Honor. Well, first of all, the statute itself does not draw any distinctions. In fact, we would argue that the statute on its face plainly encompasses my clients, the statute, 42 U.S.C. section 3796 B.A., has a definition of public safety officer. It is, quote, an individual serving a public agency in an official capacity with or without compensation as a firefighter. Serving a public agency, Your Honor, is not employed by a public agency. The legislative history doesn't support their argument. Now, they cite to the Myers, Eilbert, Callow, Quaid. However... Is there a difference between serving and employing? I believe it is. Serving is broader. I believe that... Well, you talk about, for example, people in the army serving. They're also employed. Yes, they are. It's the same. It's the same thing, isn't it? To provide service is different than to... One can provide services without being employed. I mean, for example, when I go to a restaurant, a waiter serves me, but that waiter is not my employee. In fact, it's the employee of the restaurant. Claimed dictionary meaning of service is much broader than employed. Your Honor, I'd also like to direct your attention to the legislative history. And actually, this is cited in the Amber Messick case at page... I have a Westlaw printup. It's at page six of the Westlaw printup. There is a House Judiciary report, quote, which states that, quote, since firefighting has been determined to be one of the most hazardous professions, the committee is of the opinion that coverage should extend to all activities, close quote. Now, that's much broader and much, much more encompassing, and certainly much more on point than the Myers-Eilberg colloquy, which is the sole piece of legislative evidence BJA support for this. Now, BJA acknowledges in its briefs, as it must, that the Myers-Eilberg colloquy arose in discussion of who was a law enforcement officer. Now, the firefighter... Can I just... On that point, I just found the site to the House report that you referred to. Why does that... It says the committee is of the opinion that coverage should extend to all activities performed by firemen where they are actually and directly engaged in fighting fires. That went to the activities that are being performed, not to who should be covered in the first instance. Isn't that right? It says who should be covered in the first instance, but it also says any and all activities, and it makes no distinction there between private or public. The only thing they have is the Myers-Eilberg colloquy, which, as they acknowledge, deals with law enforcement officers. It's taken out of context, and for that reason alone, I submit it should be rejected for the very reasons that the Myers-Eilberg colloquy is placed in the Barnhart versus Sigmund Kohl case cited in our brief. There, you had similar legislative statements, and you had a statement by Senator Rockefeller, which appeared to support the petitioner's position directly on point, and Justice Thomas said, no, I'm not going to take this. It was taken out of context. It was in one... It was in one house of the Senate. It was after... It was after the other house had voted on it, and I think that for... Similarly, for contextual reasons, the Myers-Eilberg colloquy has been taken out of context by the BGA. It also appears to be applying to a completely different situation. The question was, would private security guards who assist law enforcement be covered by the PSOBA? And Mr. and Representative Eilberg's comment was, no, they would not. Well, Your Honor, I view that as becoming... As taking what I would call the hue and cry scenario, the old English rule that basically, if there was a felon who was fleeing justice, every able-bodied male citizen had to join in and help run him to the earth. I think a hypothetical that would help illustrate that is, in my hometown in Minneapolis, we have several small private colleges that employ their own on-campus security. If the Minneapolis police were to pursue a suspect onto those campuses, and one of the private guards were to assist the law enforcement and die in the process of corralling the suspect, that's the situation that the Myers-Eilberg colloquy gets to. It does not, however, address the situation we have here, where two government agencies have assigned a core function, flying air tankers to suppress firefighters, to contract employees and have used them for that purpose. These were not interlopers. These were not people corralled at the spur of the moment. These were who these people were. This was their job. These were the people who the CDF and the U.S. Forest Service turned to when they needed to fly air tankers to drop retardants on fires. That was their standing role. That was their official capacity, and that's why they were functionally within these agencies. Your honors, I believe I'm over at this point. All right. What does that say? Well, you'll have another five minutes or so if you need it. Mr. McAlellan? Thank you, your honor. If the court wishes, we can brief this issue of the retroactivity of the new regulation. The Holstein and, for that matter, the Groff and the LaBarbera announcements on this issue are not just agency interpretations. They are formal adjudication of claims. I have found it hard to pin down the line between informal adjudications, which amounts to everything from a phone call request that gets denied on the phone, presumably you could call that an informal adjudication, to everything that all the way up to an extraordinary rulemaking on a record type adjudication on a full record and so forth. What is the line, for purposes of Chevron, as best you can ascertain for purposes of formal versus informal adjudication? I don't know where precisely the line is, but this looks a lot like what resulted in the Board of Immigration Appeals decision in INS versus Aguirre-Aguirre. In that process, a claim can go first, well, back then it was the INS. If it's denied there, it can be brought to an immigration judge. This next part still happens. If the immigration judge denies it, it can go to the Board of Immigration Appeals. Through that process, there are what we would normally expect to see in a formal adjudicated process, representation, the ability to present evidence, cross-examination of other evidence, and a decision by a decision maker. The same type of process is found here, and we've put in the addendum to our reply brief in GRUV, the regulations that set forth the same types of review steps and presentation of evidence steps. If one were to look for the analog to what happens here, it would be what went on in INS versus Aguirre-Aguirre, which was found to be entitled to Chevron deference because not only the type of process, but the entrusting by statute of that type of claim to the Attorney determination whether a claimant is entitled to a benefit. Wherever that line is, we are on the side of the line here of an adjudication that's entitled to Chevron deference. That's what this court determined in Amber Messick. That was a claim. That wasn't the promulgation of the regulation. That was the adjudication. Who are the hearing officers that, I know there are several levels, but are these people who are independent of the agency, are they in the capacity of administrative law judge type roles, or are they simply employees of the Department of Justice who serve as hearing officers when these claims are filed? It's the first, Your Honor, as I understand it. They are independent of the agency. Their determinations are subject to review, and as I understand it now, in every case, they're subject to review by the director who's a politically appointed official within the Department of Justice. The director of what? The director of the Bureau of Justice Assistance, who issues the final agency determination, which what happened, well, it wasn't the Bureau of Justice Assistance, but in Holstein, it And what we know about Holstein is that the standard that was applied in Holstein to facts like these means, the result is that the decedent wasn't a public safety officer. So the argument that the Holstein standard was misapplied doesn't work because the facts of these two cases are, and particularly the facts of Groff, are virtually identical to those in Holstein. The argument that was made about firefighters versus law enforcement officers doesn't work because the first question is whether the decedent was serving in an official capacity. That's what 3796B and it's 9A now. That's how it starts. After that, the question is, were they a law enforcement officer, a firefighter, a chaplain, or a member of a rescue squad? Klayman's argument would collapse those in the case of firefighters to, was he just a firefighter? Well, it's not enough just to be a firefighter. One has to be a firefighter who was serving in an official capacity, which is the question here, and the answer here is no for the reasons we've said. The, and it didn't matter that that column came out of the law enforcement officer bill because the question there was, had to do with privately employed individuals. There they were talking about security or safety officers, but the concept is the same. The concept is applicable here, and the difference in the wording between the law enforcement bill and what became the PSOPA is virtually identical. They just moved one clause later on in the paragraph. I take it that your position is the reason the word service was used as opposed to employment is because they wanted to pick up volunteer firefighters. I don't know whether that was the reason, but it was, one can see from the language that it was supposed to pick up people who, in addition to employees. So if they were serving in some other type of official capacity and. A lot of the regulatory language and even the statutory language is a little bit cumbersome, I think, because the writers of regulation seem constantly to be aware of the problem of not wanting to exclude people who are specifically included by the statute, which is to say the volunteer firemen, firefighters. So anytime you start down the road of talking about employee or employment or anything like that, you suddenly start having a problem with running into those people. The language seems a little difficult to apply in some instances, but your argument, I take it, is that a volunteer fireman is covered as long as that is an officially sanctioned fireman, officially part of the firefighting unit, that is a state or federal unit, but a person who is a contract employee of the same firefighting unit, even though neither of them is an employee, but that second person is not covered. And because of not being in an official capacity, even though there has been an official contract. Right. And the reason is because this act and the Ninth Circuit and Russell identified this legislative history was to assist in a certain, to a certain extent, the recruitment of people to public agencies. It was to offset the low pay and the minimal benefits, including death Mr. Labar and Mr. Gruff were not recruits to a public agency. They were, they were recruited by a private company and that, that the intent of Congress in passing the PSOVA just doesn't extend to that. Right. Thank you. Thank you. Mr. Gray. Thank you, Your Honor. Your Honors, perhaps I should begin by addressing the same question that Judge Bryson asked my opposing counsel, where the line is between formal and informal adjudication. I don't think that it's necessary for the court to decide that today. I think it's frankly, a very grainy line that the Supreme Court hasn't really given much guidance on. It suffices for our purposes to know that these, these hearing officer adjudications fall below the line. And here is why I say that. If you look at the Meade case, which we had cited in our brief, the Meade case specifically stated that the tariff classifications the customs had adopted were not entitled to Chevron deference. They could be titled Skidmore deference on a case by case basis. And one factor that they noted was that there were 46 different customs offices issuing 10 to 15,000 tariff classifications each year. And they quoted any suggestions that rulings intended to have the force of a law being churned out at a rate of 10,000 a year at an agency's scattered offices is simply self-refuting. That is at 533 U.S. 233. Now, Your Honors, we've drawn an analogy. We think there's pretty much an exact analogy between the type of hearings we had here and the type of hearings in the system that the social security administration has in its disability claims. But what about Amber Messick? Amber Messick, Your Honor, the issue actually, Amber Messick, I've read the briefs in that case. They are, I pulled them off Westlaw and Amber Messick, the claimant conceded that Chevron deference applied. It was never argued. Skidmore is not even cited in the lower courts case in this case or any of the briefs. But, but the opinion itself clearly, and it's not DFDA, decides and analyzes this and decides that it's Chevron deference that applies. How can a subsequent panel ignore that? I think that it can be distinguished by the fact that there was a regulation at issue in that case. The idea that EGA's regulation dealing with line of duty, which was promulgated through the notice in common procedure, specifically states that a firefighter is not killed in the line of duty unless he is actively engaged in suppressing fires. And that is basically the same, that correlates with the definition that the EGA put forward in that case for a definition of firefighter, one actively engaged in suppressing firefighters, which incidentally my clients meet. So I think the cases can be distinguished on those grounds. I don't think Chevron was even, I don't think Chevron or Skidmore was raised. And I believe the panel can distinguish those cases on that grounds and return. Well, you, you started down the line of talking about the, the informality of this process and comparing it with, with Meade and Meade certainly is an informal, pretty informal process. Many, many decisions, no recitation of no, no following of precedent, no recitation of the facts, et cetera, et cetera, just essentially summary dispositions. You win, you lose. But in looking at the opinions, for example, the opinion in Groff, which is about 12 single space pages, cites authority as following hearing on the record with evidence and so forth. And it looks like something that's a far cry from the informality of Meade and looks much more alike what we would normally associate with an adjudicative determination in a, in a relatively formal setting. What is it about the process that you think differentiates this process from something that you would call truly a formal proceeding? We laid out the differences, but what we think are truly formal in our briefs and our discussions of the brand X and the Pescara and the Aguirre-Aguirre discussions, those were significantly much more detailed and expansive proceedings. And in the case of Aguirre-Aguirre, I know the court, my opposing counsel, relied on that extensively. Aguirre-Aguirre deals with immigration, which as the court in the Aguirre-Aguirre case recognizes is an area that Congress has virtually plenary control and Congress had delegated to the attorney general, basically the determinations at issue and specifically in the statute states that the attorney general's determinations, quote, with respect to all questions of law shall be controlling. Now that's extremely broad grant of an extremely plenary authority of the attorney general. I think it's quite proper to, to that. But if you look at what we had here. I think we've pretty much exhausted the time now. Okay. Thank you very much. Thank you. If we need to have the If we need to, we will send, we'll send it afterwards. Thank you. The case is submitted.